IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| TAGT, L.P., | § | Case No. 06-32356-H1-11 |
| Debtor. | § | |
| | § | |
| In re: | § | |
| Yorkshire, LLC, | § | Case No. 06-32595-H1-11 |
| Debtor. | § | |

## MEMORANDUM OPINION REGARDING SANCTIONS

Terry Luedtke and George Luedtke seek sanctions against Tracy Knight, John Leonard, Russell, Leonard, Key and Key, PLLC, and Ronald Yandell.  The central issue is whether the bankruptcy petitions in these two cases were filed in bad faith.  On October 5, 2006, the Court conducted an extensive evidentiary hearing on this matter.  The hearing commenced at 9:00 a.m. and (after several interruptions) concluded at approximately 9:00 p.m.  After considering the testimony of the witnesses and considering the documentary evidence, the Court is clearly convinced that the two petitions were filed in bad faith.

### Background

In 2003, the Luedtkes and Knight decided to start a business in Houston, Texas.  The business would be a custom slaughtering house and would be patterned after a similar business owned and operated in the Dallas area by George Luedtke.  Knight's brother was an attorney and assisted in developing a corporate structure.

The business model was not complex.  Livestock would be made available for purchase by the public.  The livestock—once purchased—would be processed for the customer.  A variety of livestock was made available—beef, lamb, chicken, etc.  The target customers were members of ethnic groups that required specialized processing of their meats.  Although the business

would allow customers to bring in livestock purchased elsewhere, that was not part of the core business model. Because the slaughterhouse only processed livestock that was owned by the customer, it was subject to less regulation than a slaughterhouse that processed and sold its own livestock.

Separate legal entities were formed to provide various functions. Only three are significant to the issues before the Court. Harris Country Farms[1] was the processing company. The building that housed the facility was owned by TAGT, L.P. TAGT leased the facility to Harris Country Farms. Yorkshire, LLC was the sole general partner of TAGT.

Knight developed the original business plan for Houston. He selected the location and arranged for the acquisition of the property on which the facility would be constructed. The Luedtke family had been involved in the custom slaughterhouse business for years. George and Terry's father had owned a custom slaughtering business. Their brother Allen—who was eventually brought in to manage Harris Country Farms—was also experienced in the business.

Despite this planning, the initial business was undercapitalized. Most of the capital was borrowed from Brenham National Bank. However, the organizers of the business had underestimated their total costs and the amount of initial equity proved inadequate. When additional capital was needed, Terry Luedtke was the only one with both a capability and a willingness to place additional cash in the business. Knight made his initial cash investment and one small additional investment. Although Knight would make commitments to invest additional cash, he would back out of those initial commitments and insist on investing only sweat equity. Nevertheless, the Luedtkes acquiesced in this "sweat equity" arrangement and the business progressed.

---

[1]   Harris' actual legal name was Harris CF, Limited Partnership. However, the parties referred to the entity as Harris Country Farms and the Court will adopt that terminology.

Knight's sweat equity was to work in the management of the new business.  However, Knight tired of working only for sweat equity and insisted that he be paid a salary for his work for the business.  Terry Luedtke refused to put additional cash into the business in order to pay a salary to Knight.  Knight refused to continue to work on the business and absented himself from the daily operations.

### The Brenham National Bank Loan

Brenham National Bank divided its loans into two segments.  Harris County Farms had an equipment loan for $493,920.  TAGT had a real estate loan for $668,000.  Two significant problems arose.  First, Knight had written a check for $60,000.  He failed to enter the check in the company's records.  By all accounts, this failure was inadvertent.  Nevertheless, when the owners discussed capital needs, they failed to account for the fact that Brenham had advanced the $60,000 to cover the unrecorded check.  This was one of the events that led to the poor capital planning and the disagreement about "sweat equity."  Second, some of the equipment became affixed to the building.  Brenham was unwilling to renew the loans at maturity (and unwilling to accept payment on the matured and unrenewed loan) unless TAGT executed documents granting a lien on the attached equipment.  The Luedtkes and Knight had each guaranteed Brenham's loan.  Accordingly, Brenham insisted that Knight (in his guarantor capacity) ratify the additional lien on the attached equipment.

Because Knight had distanced himself from the business, he initially declined to execute the document[2] required by the Bank.  Nevertheless, after some prodding by his own lawyer, Knight executed the document.  By that time, Knight's refusal had resulted in a payment default

---

[2] There is conflicting testimony as to exactly which document Knight failed to execute.  The rendition set forth above is the one that the Court believes to be most likely and is given for background purposes.  The important issue is not which document Knight did not initially execute.  The only important issue is that Brenham declined to renew the loan unless Knight executed a document required by the Bank.

to Brenham National Bank.  The default did not result in an acceleration of any debt to Brenham.
The payment default was cured immediately after Knight signed the document.

## State Court Lawsuit

In the spring of 2005, Knight sued TAGT, Yorkshire, Harris Country Farms, the three
Luedtke Brothers and Harris Country Farms' general partner in the 89th Judicial District Court
of Wichita County, Wichita Falls, Texas.  Wichita Falls appears to have been a technically
acceptable forum for the lawsuit.  When the companies were formed, Knight's brother was the
attorney and the agent for service.  He lived in Wichita Falls and it was, therefore, an allowed
forum.  However, Knight and Terry Luedtke lived just outside of Houston and George Luedtke
lived just outside Fort Worth.

The Defendants sought to change the venue of the state court lawsuit to Harris County,
Texas.  Inexplicably, Knight fought the transfer to Harris County.  Instead, he filed pleadings
with the State District Court seeking to transfer the lawsuit to Dallas.  There appears to be no
basis for venue in Dallas unless the purpose of the fight was to force the defendants to have
increased litigation costs.  The only witness that lives close to Dallas is George Luedtke and he
preferred a Houston venue.  Knight lived closer to Houston.  The business was in Houston.
Indeed, even Knight's lawyer (Michael Essmeyer) was a Houston attorney.

Although Wichita Falls was a proper legal venue, from this Court's review, there was a
substantial probability that the lawsuit would be transferred to Houston based on the convenience
of the parties and witnesses.  The hearing on the motion to transfer venue was scheduled for
March 10, 2006.

### The Owners' Meetings

In February 2006, the Luedtkes called meetings for each of the entities.  Proper notices were sent to Knight that established the meeting date as March 3, 2006, at 10:00 a.m.  Knight requested that the meetings be postponed because he had previously scheduled a trip to Port Mansfield, Texas.  The Luedtkes accommodated that request and postponed the meeting to March 8, 2006.

The postponement was not done by formal notice.  Rather, the postponement was done by an e-mail exchange between the lawyers for the principals.  It is unclear whether the e-mail exchange would have been legally enforceable if the Luedtkes had reneged on the agreement.  Nevertheless, the Luedtkes honored the e-mail exchange and did not hold the scheduled March 3, 2006 meetings.

The notices scheduling the meetings made clear that one of the topics to be covered was the removal of Knight from any position of authority in Yorkshire.  Yorkshire was TAGT's sole general partner.  If Knight's authority were removed from Yorkshire, he would be relegated to the position of a minority equity owner with no portfolio of authority.  The Luedtkes controlled a sufficient voting percentage (pursuant to documents originally drafted by Knight's brother, the Wichita Falls attorney) to oust Knight from any position of authority.

The most telling testimony about the planned meeting came from Knight.  Knight testified that he knew that the outcome of the planned meeting was a foregone conclusion.  He knew with certainty that he would be removed.

The meeting did occur on March 8, 2006.  Although Knight had requested the postponement of the meeting until March 8, he did not attend.  Knight never inquired as to the

results of the meeting—and did not need to.  He had known for weeks what the conclusion of the meeting would be.  He was ousted from any management position with the entities.

### Timing of the Bankruptcies

Knight hired Leonard as his bankruptcy lawyer.  On March 3, 2006, a chapter 11 petition was filed by both Yorkshire and TAGT.  Leonard signed each petition as the attorney for the debtor.  Knight signed each petition as the "President, Manager."

On March 3, 2006, there were two looming events.  First, the March 8, 2006 meeting was scheduled.  That meeting would surely divest Knight of any authority.  Second, the hearing on the motion to transfer venue of the state court lawsuit was set for March 10, 2006.  The filing would terminate that scheduled hearing.

Immediately after the bankruptcy cases were filed, the state court lawsuit was removed from the Wichita Falls State District Court to the United States Bankruptcy Court in Wichita Falls.

The evidence shows that on March 1, 2006, or March 2, 2006, Leonard contacted attorney Yandell and asked Yandell to file the bankruptcy cases for Yorkshire and TAGT. Yandell testified that he would not file the cases until he had completed his investigation. Leonard testified that Yandell declined to file the cases.

By March 9, 2006, Yandell filed a motion to substitute as debtors' counsel in the stead of Leonard.  The Court credits Yandell's recollection of the events—Yandell needed to conduct an investigation.  Once that was complete, he agreed to serve.

Nevertheless, 1-2 days after Yandell was first contacted by Leonard, Leonard and Knight chose to proceed with the bankruptcy filing.  Notably, Knight was still in Port Mansfield.

6

Leonard tracked him down, faxed the bankruptcy petitions to Knight, had Knight sign the petitions, and then filed the two bankruptcy cases all on March 3, 2006.

Neither Leonard nor Knight can give a cogent explanation as to why the bankruptcy case was filed on March 3, 2006. No property was posted for foreclosure. There were no pending emergencies. Rather than honestly acknowledging that the bankruptcies were filed to avoid the outcome of the March 10th state court venue hearing and to avoid the outcome of the March 8th owners' meetings, both Knight and Leonard testified that the timing of the filing was routine.

The Court rejects that testimony. It lacks credibility.

### Authority

Authority to file the Yorkshire and TAGT bankruptcy petitions must be determined from the state law governance documents of those entities. *In re Phillips*, 966 F.2d 926 (5th Cir. 1992). TAGT's sole general partner was Yorkshire and it had authority to act for TAGT. Yorkshire was an LLC and a bankruptcy filing by Yorkshire was controlled by its managers.[3]

Yorkshire's organizational documents only allowed Yorkshire to act through the consent of its managers. The managers could also give written consents or could delegate authority. No written consents or delegation was given. Only Knight consented to the bankruptcy filings. Accordingly, the only argument that could be made that the bankruptcy filings were authorized necessarily required a conclusion that Knight was the sole manager of Yorkshire.

As set forth above, an issue had arisen in December 2005 regarding the Brenham National Bank loans. To resolve that issue, Brenham National Bank required a corporate resolution. A corporate certificate was drafted by the Luedtkes' attorney, Sidney Levine. That certificate read, in part:

---

[3] In some of the pleadings, the respondents alleged that Knight had the inherent authority as President of Yorkshire to cause the bankruptcy filings. That argument was largely abandoned at trial. To the extent that it was not abandoned, it is rejected as specious. *See In re AT Engineering, Inc.*, 138 B.R. 285 (Bankr. M.D. Fl. 1992).

"**Officers of Yorkshire, L.L.C.:**

President—Tracy Knight

Secretary—George Luedtke

**Managers of Yorkshire, L.L.C.:**

Tracy Knight

_____

We, as President and Secretary of Yorkshire, L.L.C., and on behalf of Yorkshire, L.L.C., general partner of TAGT, Limited Partnership, certify the following facts:"

Levine testified that the line shown above was intended to be a blank into which the name of the other manager should be filled in.  However, it is unclear from looking at the document whether the line was a blank to be completed or whether the line was merely a separator from the balance of the document.

In any event, George Luedtke and Tracy Knight each signed the certificate.  Neither completed the blank.  There is no evidence as to the date that Knight signed the certificate.

Knight testified that the Luedtkes exercised absolute control over Yorkshire's corporate affairs.  Knight had never attended a meeting at which he was named the sole manager and had no knowledge of why he was named as the sole manager in the certificate.  He claims to have signed the certificate—not knowing whether the certificate was accurate—on his assumption that the Luedtkes had somehow decided to make him the sole manager.  Luedtke also signed the certificate, but did not review it to notice the error.  Luedtke's signature was notarized on December 19, 2005.  Knight's signature is neither notarized nor dated.

Leonard and Knight decided to take advantage of the clerical error.

To place the certificate in context, the Court has examined Leonard and Knight's conduct and the range of action available to them. The following events and statements give the appropriate context.

First, Knight claimed that the Luedtkes exercised complete control over who the managers would be and what their responsibilities would be. Accordingly, he alleges that he did not question the certificate's accuracy. Knight knew that he had not been at any meeting at which such a monumental decision was made and had not seen any prior correspondence concerning this decision. He was uninvolved in the daily business affairs. Knight had already sued the Luedtkes in state court; appointment of Knight as the sole manager would have been highly unusual conduct given the ongoing litigation. The Court concludes that Knight knew the document was inaccurate when he signed it.

Second, the document was signed in mid-December 2005. The document stated that George Luedtke was the corporate secretary. Even if Leonard and Knight had believed that the certificate was accurate in December 2005, they relied on it for the bankruptcy filing in March 2006. Given Knight's belief—communicated to Leonard—that the Luedtkes exercised absolute control, it is inconceivable that Leonard and Knight failed to conduct any due diligence on the identity of the managers who could authorize a bankruptcy filing. Neither Leonard nor Knight called the corporate secretary (identified in the same document) and asked for the identity of the managers. Although Knight's state court lawyer was given regular access to the LLC's records, he never asked to review the minute book to identify the current managers. Neither Leonard nor Knight checked the on-line records of the Texas Secretary of State that (apparently) showed that there were two managers.[4] The February 15, 2006 Notice of Special Meeting of the Members of

---

[4] Because no one checked on March 3, 2006, there is no evidence to show what the online records reflected on that date. However, both before and after March 3, 2006, the Secretary of State's records listed two managers.

Yorkshire LLC (setting the March 3, 2006 meeting that was continued to March 8, 2006) stated that the first purpose of the meeting was "To remove the Managers of Yorkshire LLC who are presently serving."  The Court notes that if a single manager was serving, the Notice would have properly read "To remove the <u>Manager</u> of Yorkshire LLC who <u>is</u> presently serving."  Without doubt, Leonard and Knight were on notice that there were multiple managers.

Third, Leonard and Knight decided to keep secret that the bankruptcy would be filed.  If they had let any person know of the filing, they would be unable to take advantage of the situation.  Yorkshire and TAGT had only one third party creditor—Brenham National Bank. Leonard is a board certified business bankruptcy lawyer.  As of March 3, 2006, Brenham National Bank had not posted the property for foreclosure and had been a cooperative lender. Under those circumstances, the filing of a bankruptcy without notice to the only third party creditor—and one with a lien on substantially all of the debtors' assets—is truly astounding.  It is fundamental that an experienced bankruptcy lawyer like Leonard would not do so absent a compelling reason.  When asked, Leonard had no explanation.  That is because Leonard knew that Brenham National Bank would have contacted the Luedtkes, the identity of the managers would have been unambiguously clarified, and Knight's lack of authority would have become even more patent.  Leonard and Knight also failed to review a single official corporate record. No attempt was made to contact the corporate secretary.  Knight testified that Terry Luedtke actually possessed all of the corporate records.  No attempt was made to contact Terry Luedtke. Only a surprise attack would leave Knight and Leonard with the ability to feign reliance on the certificate.

This Court is extraordinarily troubled by that conduct.  First, the certificate was signed by Knight.  He knew when he signed it that it was probably false.  Second, Knight (if he believed

the certificate that he signed) was the President and sole Manager of Yorkshire.  In those capacities, he was a fiduciary.  One must ask how he carried out that duty by engaging in a surreptitious bankruptcy filing without notice to any of the beneficiaries of his fiduciary duties.  Third, Leonard purported to act as attorney for Yorkshire and TAGT.  He too purported to act as a fiduciary.  Fiduciaries do not act in stealth to inflict harm on their beneficiaries.  Yet, that is what Leonard chose to do.

Leonard testified at length about his due diligence in this case.  However, the more he testified, the more convincing was the movant's case.  Leonard's conduct—ostensibly on behalf of TAGT and Yorkshire—was not an objective analysis of the question of authority to file these bankruptcy cases.  It was an analysis done with bias towards an outcome—the desired outcome being that Knight would be determined to have authority.  Faced with facts that showed that Knight lacked authority or—at a minimum—that further investigation was warranted, Leonard chose to look no further.  Instead, he researched arcane legal theories to justify his conclusion.  He ignored settled law.  He failed to contact the Bank or the other members.  He wrote a draft brief on corporate governance that heavily relied on (i) outdated legal authority on corporate governance that predated WWII; and (ii) current authorities that are cited for propositions for which they do not stand.  If a lawyer is prepared to disregard the facts and ignore the law, he can come to a legal conclusion that satisfies his client.  That is what Leonard did.  Throughout, he treated Knight as his client.  Had he treated Yorkshire and TAGT as his clients, he would not have come to the same conclusions.

The fact that Leonard treated Knight as his client is further illustrated by his post-filing conduct.  The bankruptcy petitions were filed March 3, 2006.  Yandell filed a motion to substitute as counsel on March 9, 2006.  The Court approved Yandell's substitution on March

13, 2006.  Then, on March 31, 2006, Leonard filed a motion to substitute as counsel *against* the debtors in adversary proceeding 06-7001.[5]   On April 25, 2006, Leonard filed an amended complaint in which he represented Knight against TAGT and Yorkshire, among others.  The prayer in that complaint seeks a temporary restraining order without notice, temporary and permanent injunctions, an accounting, a receiver over all of TAGT and Yorkshire's assets and exemplary damages.

Leonard did not review the authority issue from TAGT or Yorkshire's perspective.  He was always Knight's lawyer.  When he filed the chapter 11 petitions for TAGT and Yorkshire, he masqueraded as TAGT and Yorkshire's counsel.  He was, in fact, serving only Knight's interests.

**Reasons for Filing**

In late 2005, Knight demanded $2,500,000 for his interest in the related slaughterhouse businesses.  He had invested some sweat equity and less than $60,000 in cash.  Of course, Knight had the right to retain or sell his interest as he saw fit.  However, when his demand was summarily rejected, Knight decided to inflict injury on the Luedtkes.  The Court does not reach this conclusion based on any affirmative statement by Knight, but based upon his conduct.

No other conclusion comports with the facts.

Various excuses were offered by the respondents as to why the bankruptcy cases were filed:

**To Report a Crime**

In his October 3, 2006 brief, Leonard alleges that the bankruptcy cases were filed because Knight had a duty to report bank fraud.  The argument is as follows:

---

[5]  The state court lawsuit was removed to Bankruptcy Court.  This is the Northern District of Texas adversary cause number of the removed lawsuit.

- The loan documents with Brenham National Bank prohibited insider transactions.

- Livestock was being purchased from insider entities.

- This breach of the loan documents was a fraud on Brenham National Bank.

and

- Brenham National Bank lent funds secured by the equipment.

- The equipment appraisal reflected a lower value than the amount loaned.

- This absence of value demonstrated a fraud on Brenham National Bank.

Notwithstanding these allegations, it is apparent that these had nothing to do with why these cases were filed. If Knight had a reporting duty, he found a very strange way to honor his obligation. First (and most obviously), neither he nor Leonard ever told Brenham National Bank about their allegations. If they truly believed that the Bank was being defrauded, one would have expected them to inform the Bank. Second, neither Knight nor Leonard reported this fraud to the U.S. Attorney, the District Attorney or any law enforcement agency. Third, United States Bankruptcy Courts are not charged with a duty to conduct, prosecute or adjudicate a criminal violation. If crime reporting was the motive for the bankruptcy filing, it was a strange course of conduct, indeed.

**Default to Bank**

The second excuse for the filing was that there was a bank default. The default, of course, was caused by Knight's own conduct. Moreover, the default had been cured by the date of the bankruptcy filing.

Knight provided Leonard with a copy of the default letter from the Bank. Neither Leonard nor Knight contacted the Bank or the Bank's attorney. As set forth above, such conduct is extraordinarily unusual. Moreover, when the precipitating event for the bankruptcy case is a

possible uncured loan default, it is truly shocking that a case would be commenced without confirming that the default remained uncured.

In fact, Knight knew that the default had been cured.  Knight was a guarantor of Brenham National Bank's loans.  He received monthly statements reflecting the payment due to Brenham National Bank.  Although Knight's monthly statement was not introduced into evidence, the undisputed testimony was that he received the statement, that the statement reflected amounts due, and that the payment default had been cured before the bankruptcy cases were filed.

Leonard—supposedly acting as Yorkshire and TAGT's lawyer—failed to take any action to verify the continuing default.  Had he made any attempt to confirm it, he would have learned that it had been cured.  At one point (the date is unclear from the record), Knight's state court lawyer asked the Luedtke's state court lawyer whether the default had been cured.  The Luedtke's state court lawyer did not know.  On that slim thread of an absence of knowledge, these bankruptcy cases were allegedly commenced.

The Court declines to accept this explanation.

**Need for Capital**

The third excuse given for the filing of the petitions is that the debtors were short on capital.  The evidence is undisputed that TAGT lost money each month.  However, it is also undisputed that Terry Luedtke advanced money each month to cover TAGT's losses.

The evidence is undisputed that Yorkshire had no monthly losses.

Terry Luedtke was a guarantor of the Brenham National Bank loan.  He had an incentive to advance funds monthly to avoid a call on his guaranty.  He made the monthly advances.  Moreover, the financial information showing the monthly advances had been provided to Knight through his state court lawyer.

Accordingly, Knight had no reason to believe that there was an immediate capital shortfall.  There was a reason to believe that TAGT should consider its capital structure to assure a continuing ability to meet its monthly losses.

The notice of the March 3, 2006 meeting (moved to March 8, 2006) explicitly set forth that Yorkshire and TAGT would consider their "finances and obligations," "plan for payment of indebtedness," and "plans for raising additional capital…if necessary."   If Knight and Leonard were concerned about these issues, the obvious first step was to attend the meeting so that an appropriate plan of action could be devised.

Instead, they placed these companies in chapter 11 bankruptcy.

Neither Leonard nor Knight explained how placing TAGT and Yorkshire into chapter 11 bankruptcies would assist their fund raising efforts.  The evidence reflects that the bankruptcy filings would, instead, have a deleterious effect.  There was a single secured creditor and no non-insider creditors.  It is inconceivable that a bankruptcy court would have subordinated Brenham National Bank's secured claims to allow funds to be raised to pay insider claims.  Brenham National Bank was not threatening foreclosure, and (as set forth above) its loan was not in default.  It is fundamental that a bankruptcy filing under these circumstances would make it substantially more difficult to raise additional capital.  What investor prefers to invest in a bankrupt company (rather than a non-bankrupt one), junior to existing debt?

The Court rejects this motive for the filing.

**Actual Motive**

Neither Leonard nor Knight offered any other explanation.  The incredible explanations offered by them highlight the true motive.  Knight was angry at the Luedtkes.  He had invested

15

his money and effort as a minority investor in a family controlled business.  Knight did not like the way that the business was being run.  His former friends had become his adversaries.

At least some of Knight's complaints with the Luedtkes could be legitimate.  On one occasion, Allan Luedtke violated the applicable regulations when he slaughtered an animal and placed the meat for sale by Harris County Farms.  Financial information does not appear to have been well distributed.  Livestock was purchased from insiders even though such purchases were prohibited under Harris Country Farms' loan agreement with Brenham National Bank.

Knight sued the Luedtkes and the business entities for these alleged violations in state court.  That was his proper remedy.

Nevertheless, the remedies for minority shareholders are limited.  Knight was surely frustrated.  These bankruptcy cases were filed when Knight got dissatisfied with his state law remedies and decided to inflict injury on the Luedtkes.  Accordingly, the bankruptcy cases were filed with a bad motive and with no meaningful thought being given to the actual purposes of chapter 11 bankruptcy.

### Yandell

Rule 9011 of the Federal Rules of Bankruptcy Procedure requires a movant to give at least 21-days notice to a person who may be subject to sanctions.  There is an important exception to the 21-days notice rule.  The filing of a petition in bankruptcy invokes substantial federal power.  An automatic stay comes into effect.  The assets owned by the debtor leave the debtor and become property of the estate.  An inappropriate bankruptcy filing can destroy the credit of a creditworthy entity.  Accordingly, no 21-day letter must be sent if "the conduct alleged is the filing of a petition in violation of subdivision (b)."  FED. R. BANKR. P. 9011(c).

Knight and Leonard filed the petition. Yandell was unwilling to file the petition. Yandell did not receive 21-days notice of the motion for sanctions. Accordingly, Rule 9011 sanctions are inappropriate against Yandell. Nevertheless, the Court has the inherent power to sanction lawyers in cases before the Court. *Chambers v. NASCO, Inc*., 501 U.S. 32 (1991).

Yandell's conduct does not rise to the level that compels the Court to utilize its inherent powers. By the time that Yandell appeared, the cases had been filed. The debtors, the Luedtkes and their counsel were all informed that Yandell was appearing for the debtors. However, no one approached Yandell and told him that he needed to recognize the Luedtke's authority over the debtors.

At the March 8, 2006 meeting, Knight was removed from any position of authority over Yorkshire and TAGT. Had Yandell been so informed, he would have accepted instruction from the proper parties.

The Court recognizes that Yandell's better practice would have been to call a meeting with all of the owners. Yandell also should have investigated the outcome of the March 8, 2006 meeting—he was well aware of its occurrence. Yandell should have been highly suspicious of Knight's motives and of the very fact that the bankruptcy cases were filed. However, Yandell came in after the major damage was inflicted. Just as Yandell should have been more thorough in his investigation, so should the Luedtkes and the debtors have asserted their right of control directly to Yandell.

The Court does not find Yandell culpable.

### Russell, Leonard, Key and Key, PLLC

Movants seek a recovery from Leonard's law firm, Russell, Leonard, Key and Key, PLLC. The undisputed testimony is that the "law firm" is merely an expense sharing

arrangement.  No person other than Leonard receives any portion of his revenues.  No other person worked on these cases.  The Court declines to impose sanctions against Leonard's law firm.

### Sanctions

In determining appropriate sanctions, the Court should limit the sanction to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. FED. R. BANKR. P. 9011(c).  *In re Porcheddu,* 338 B.R. 729, 742 (Bankr. S.D. Tex. 2006).

This Court has the inherent authority to regulate the practice of litigants and lawyers appearing before it.  *Chambers v. NASCO, Inc*., 501 U.S. at 43.

The Court has examined what sanctions have been imposed by other courts. Frequently the amount of sanctions is determined by examining opposing counsel's attorneys fees.  In general, this Court rejects fee shifting as the only appropriate measure of sanctions.  The fees incurred by others may or may not properly measure the amount that is appropriate to deter future wrongful conduct by a party.  *Fox v. Acadia State Bank*, 937 F.2d 1566, 1571 (11th Cir. 1991).  The Court will examine the particulars of the conduct, the party, and the required deterrent in order to assess an appropriate sanction.

In *Chambers,* the Supreme Court affirmed the imposition of sanctions of $996,644, disbarment and suspension for bad faith conduct of a defense of a contract suit.  *Chambers*, 501 U.S. at 55-58.  In that case, the monetary award was based on a measure of opposing counsel's fees, but additional sanctions were added to assure proper deterrence.  In other cases, sanctions have been limited to an admonishment of counsel.  However, admonishments are generally limited to situations that are substantially less egregious than the conduct before this Court. *Traina v. U.S.*, 911 F.2d 1155, 1158 (5th Cir. 1990) (reprimand for reliance on inapplicable case

law); *Cargile v. Viacom Int'l, Inc.*, 282 F. Supp. 2d 1316, 1320 (N.D. Fla. 2003) (reprimand for filing frivolous pleading where counsel subsequently advised client to dismiss case and it was counsel's first Rule 11 violation); *Miller v. Norfolk So. Ry. Co.*, 208 F. Supp. 2d 851, 854 (N.D. Ohio 2002) (reprimand for filing frivolous motion to reconsider which simply repeated earlier arguments); *Jenkins v. Methodist Hosp. of Dallas, Inc.*, 2004 WL 2871006, at *2 (N.D. Tex. Dec. 14, 2004) (reprimand for failure to proofread brief and correct erroneous quotation upon discovery of error).

The filing of these petitions for an improper purpose and without authority mandate substantial sanctions in order to deter similar conduct by these respondents and by others who are similarly situated.

In determining the amount of sanctions, the Court has considered the evidence of the damages incurred by the moving parties, the income and the net worth of the respondents, and the minimum amounts that are necessary for general deterrence.

Terry Luedtke was required to retain counsel and attend a number of hearings as a direct result of the wrongful conduct of the respondents. He testified in detail as to his damages. The vast majority of his damages relate to legal fees incurred by him for which detailed invoices were presented. The Court has determined that his actual damages are $56,183.31. George Luedtke also was required to retain counsel and to attend multiple hearings. Some of his alleged expenses (such as his cell phone expenses) were routine expenses that were not increased by the respondent's conduct. Some of his alleged expenses were not properly identified. The Court has determined that his actual damages are $3,473.00.

The debtors also suffered significant, although unquantified damages. However, the debtors have not sought relief in this proceeding, and none will be awarded to them.

Leonard has a net worth of approximately $80,000 and an annual income of approximately $120,000.  Knight has an annual income of approximately $50,000 and a net worth of approximately $300,000.

Knight was in the best position to inform Leonard of the truth of his position of authority with the debtors.  Leonard was more knowledgeable about the legal requirements for a bankruptcy filing.  Leonard and Knight are both sophisticated and understood that the bankruptcy was being filed for the improper purpose of injuring the Luedtkes.

This conduct was intentional and was surreptitious.  The Court does not believe that $30,000 per person (i.e., one-half of the approximate actual damages) is sufficient to deter persons of similar worth and income and motivation from engaging in similar conduct.  A minimum of a $50,000 sanction is appropriate against Knight.

The Court struggles with the appropriate amount of sanctions to impose against Leonard. It is true that Leonard was merely implementing Knight's will; Knight is the individual with the axe to grind.  However, this Court believes that an important principle must be vindicated to assure proper deterrence.  It is well established that a debtor-in-possession's counsel must have a single master.  Counsel must be "disinterested," without conflicting loyalties.  See 11 U.S.C. § 327(a).  This is not a case where Leonard's loyalties were blurred—Leonard was loyal only to Knight.  Rather, it is a case where Leonard deliberately ignored his duty of disinterestedness imposed by law.  It is not an issue with which a board certified bankruptcy lawyer is unfamiliar. Rather, it is at the heart of his training.  Unless a sufficient sanction is imposed, other similarly situated lawyers may abandon their ethical responsibilities and decide that "disinterestedness" can be ignored when it is convenient to do so.  Under these circumstances, the Court believes that a $40,000 sanction is the minimum sanction that will have an appropriate deterrent effect.

Moreover, the sanctions will be effective only if they are actually paid by the persons against whom they are assessed.  At the hearing, there was discussion about indemnity obligations and about responsible persons.  If any of these amounts are subject to indemnity or if another person is responsible for payment of these amounts, then they will not serve their deterrent function.

Any sanctions in excess of the amount of damages proven by the movants are properly payable to the United States.  The purpose of these sanctions is to deter; it is not appropriate that they be paid to a private party.

### ORDER

For the reasons set forth above, the Court orders as follows:

1.      Leonard shall pay base sanctions of $40,000.

2.      Knight shall pay base sanctions of $50,000.

3.      All base sanctions shall be payable care of Thomas Henderson, attorney at law.

4.      Henderson shall distribute the funds received by him as follows:

      A.      1% to Henderson to pay for his costs in administering this sanctions order.

      B.      3.86% to George Luedtke.

      C.      62.43% to Terry Luedtke.

      D.      32.72% to the Clerk of the Court for the benefit of the United States of America.

5.      Leonard shall pay to the Clerk of the Court for the benefit of the United States of America any amounts received by him from any person or entity as indemnification, insurance or contribution on account of this order.

6.      Knight shall pay to the Clerk of the Court for the benefit of the United States of America any amounts received by him from any person or entity as indemnification, insurance or

contribution on account of this order.

Signed at Houston, Texas, on October 11, 2006.

MARVIN ISGUR
United States Bankruptcy Judge